JOHN RHODES
Assistant Federal Defender
Federal Defenders of Montana
Missoula Branch Office
125 Bank Street, Suite 710
Missoula, Montana 59802
Phone: (406) 721-6749
Fax: (406) 721-7751
Email: john_rhodes@fd.org

Attorney for Defendant

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MONTANA
# MISSOULA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>THOMAS SCOTT COCKRILL,<br><br>Defendant. | CR 21-19-M-DLC<br><br>DEFENDANT'S SENTENCING MEMORANDUM |

    I believe there is good in everybody and [Thomas Cockrill] deserves another chance. I would love to see him do well and have a wonderful life. – Letter of Colleen Cockrill, adoptive mother.

    THOMAS SCOTT COCKRILL, the above-named Defendant, by and through his counsel of record, JOHN RHODES and the FEDERAL DEFENDERS OF MONTANA, hereby files the below memorandum in support of a mandatory

minimum sentence of seven years imprisonment consecutive to below-Guidelines concurrent sentences on Count I-III.

Mr. Cockrill has pled guilty to three counts of robbery affecting commerce, in violation of 18 U.S.C. § 1951(a), and one count of brandishing a firearm in furtherance of a crime of violence, 18 U.S.C. § 924(c)(1)(A)(ii). Mr. Cockrill faces a mandatory minimum punishment of seven years imprisonment. The PSR calculates a Guidelines Sentencing Range of 120-to-150 months (Total Offense Level 27, Criminal History Category V).

Mr. Cockrill disputes the calculation of the Guidelines.

## PSR OBJECTION

The seven-level enhancement for discharge of a firearm is imposed here regardless of intent. There is nothing in the Guidelines, or the commentary, which addresses accidental versus purposeful discharge.

Here, the firearm was brandished but the discharge was accidental. Mr. Cockrill did not purposely discharge the firearm. The Supreme Court has repeatedly recognized that mens rea is ordinarily required for conduct to be considered criminally punishable. *Staples v. United States*, 511 U.S. 600, 605 (1994); *Liparota v. United States*, 471 U.S. 419 (1985); and *Morissette v. United States*, 342 U.S. 246 (1952). *See also United States v. Games-Perez*, 695 F.3d 1104, 1115 (10th Cir. 2012) (Gorsuch, J., dissenting from the denial of rehearing en banc) ("The Supreme

Court has long recognized a 'presumption' grounded in our common law tradition that a mens rea requirement attaches to 'each of the statutory elements that criminalize otherwise innocent conduct.'" (quoting *United States v. X-Citement Video, Inc.*, 513 U.S. 64, 72 (1994); citing *Staples*, 511 at 610-12; *United States v. U.S. Gypsum Co.*, 438 U.S. 422, 43738 (1978); *Morissette*, 342 U.S. at 250-53)).

Federal firearms offenses almost uniformly explicitly require a mens rea component. *See*, *e.g.*, 18 U.S.C. § 922(b)(1) ("knows or has reasonable cause to believe"); § 922(b)(2) (same); § 922(b)(3) (same); § 922(d) ("knowing or having reasonable cause to believe"); § 922(i) (same); § 922(j) (same); § 922(f) ("with knowledge or reasonable cause to believe"); § 922(k) ("knowingly"); § 922(l) (same); § 922(m) (same).

Indeed, the Supreme Court has imputed a mens rea requirement for those firearms-related statutes which do not expressly have one. *See*, *e.g.*, *Staples*, 511 U.S. at 605. In that case, the Court went to great lengths to emphasize the importance of mens rea:

> [The statute] . . . is silent concerning the mens rea required for a violation [of the statute] . . . . Nevertheless, silence on this point by itself does not necessarily suggest that Congress intended to dispense with a conventional mens rea element, which would require that the defendant know the facts that make his conduct illegal. On the contrary, we must construe the statute in light of the background rules of common law, in which the requirement of some mens rea for a crime is firmly embedded.

*Id*. at 605 (internal citations omitted).

Here the Guideline and commentary are silent.  *But see*, *United States v. Wright*, 215 F.3d 1020, 1030 (9th Cir. 2000) ("Since Wright himself fired the gun, albeit accidentally, the application of the enhancement was proper."). This Court should not assume that the Commission's silence on this issue is a tacit instruction to impose the enhancement without a mens rea.  Instead, the Court should reduce the seven-level enhancement in PSR ¶ 64 to a five-level enhancement.  That would reduce the Combined Adjusted Offense Level in PSR ¶ 72 to 28, and the Total Offense Level to 25.  PSR ¶ 76.  Mr. Cockrill's correct Guidelines Sentencing Range is 100-to-125 months (Total Offense Level 25, Criminal History Category V).

## 18 U.S.C. § 3553(a) FACTORS

**A. The mandatory seven-year consecutive sentence supports a variance to below-Guidelines sentences for the other counts of conviction.**

Recent research from the United States Sentencing Commission reflects a decrease in sentences for robbery defendants generally, and those with accompanying 18 U.S.C. § 924(c) mandatory minimum consecutive sentences in particular.  *See Federal Robbery: Prevalence, Trends, and Factors in Sentencing*, United States Sentencing Commission (2022) ("Federal Robbery Report") (available at https://www.ussc.gov/sites/default/files/pdf/research-and-publications/rese\arch-publications/2022/20220818_Robbery.pdf). Over the past decade, the proportion of within-Guidelines sentences for robbery offenders has trended downward, while the proportion of below-Guidelines sentences has trended

up. Federal Robbery Report at 22 (Figure 12). "These trends mirror the trends for all federal offenders sentenced during the time period. For example, from fiscal years 2012 to 2021, the proportion of all federal offenders sentenced within the guideline range decreased from 52.4 percent to 42.8 percent." *Id*.

Increasingly, judges are taking notice of the harsh realities of consecutive mandatory minimum punishments imposed under 18 U.S.C. 924(c), and weighing that factor when varying downward for predicate robbery offenses. Although offenders with § 924(c) convictions receive longer total sentences, the robbery portion of their sentences is well below what robbery offenders who do not have § 924(c) convictions receive. Federal Robbery Report at 25 and Figure 16. "[C]ourts consistently sentence non-section 924(c) robbery offenders to sentences close to the guideline minimum." *Id*. Again, the trend over the past ten years is most illuminating: while the ultimate sentences for non-section 924(c) offenders has stayed relatively stable, the sentence relative to the Guideline has gone down sharply, by over three years in the average case. *Id*. at Figure 16.

The seven-year, mandatory consecutive sentence Mr. Cockrill must serve is serious punishment. The seriousness of this punishment warrants consideration by the Court when considering the appropriate sentences to impose on Counts I, II, and III.

## B. Mr. Cockrill has spent almost one-and-a-half years in pretrial detention.

> [The] thing that impressed me about Thomas was his honesty. He is a brutally honest person, at least with me. He shared some very intimate details of some of the abuses he has had in his life, which I feel has led to some degree, to some of his current problems. – Letter of Gary Fenlon, pastor and friend.

Mr. Cockrill was arrested on February 14, 2021. PSR ¶ 23. He has been in pretrial custody since that time, either at local jails or in Bureau of Prisons detention facilities.

> [It]is the defendant's opinion that sitting in a county jail is more difficult than sitting in a Bureau of Prisons facility. The court cannot disagree; it has heard this from many, many defendants over the years.

*United States v. Bond*, 456 F.Supp.3d 1053, 1059 (E.D. Wis. 2020) (denying motion for pre-sentence release).

> Jail time is hard time.
>
> The oldest function performed by jails is pretrial detention, one they have served since colonial times. Jails continue to perform this function, primarily because they are located near the courtrooms where trials are held. It is estimated that about half of the inmates in jail are held for purposes of trial. While very few jail functions are easy to perform under the circumstances that now exist in most jails, probably no function is more difficult to manage than this oldest one, pretrial detention.
>
> The mixture of inmates held for this purpose is the primary source of the difficulty, exacerbated by the fact that modern jails house inmates in dormitory areas (rather than cells) and staff have limited knowledge about most inmates at booking. The pretrial population of any sizeable jail will include violent and nonviolent offenders, first-timers and repeat offenders, inmates with serious mental illnesses and suicide potential, persons likely to victimize inmates and persons likely to be

victimized, more women than ever before, inmates who have committed the most minor of crimes and some who have committed the worst, and a few who have committed no crimes at all. In an ideal world, there would be at least a separation of charged and convicted inmates, dangerous and harmless persons, and first-time offenders and hardened criminals; in the real world, the ideal gives way to the challenge of finding somewhere for additional inmates to sleep in cells and dormitories that bulge at every seam.

Lawson, R., "Turning Jails into Prisons – Collateral Damage from Kentucky's 'War on Crime'", Kentucky Law Journal (2006/07), 95 KYLJ 1, 7-8.

Mr. Cocrkill's experiences on pretrial detention are a stark reminder of these conditions: while in custody at FDC SeaTac, Mr. Cockrill was sexually assaulted by a group of fellow inmates.[1] He reported that assault on his return to the Missoula County Detention Facility, as he was justifiably concerned about reporting it to the same facility that allowed the assault to occur in the first place. He underwent a sexual assault medical examination at Providence St. Patrick Hospital, which physically detailed Mr. Cockrill's sexual experience. *See* Exhibit A (filed under seal).

Courts have varied below the Guidelines in recognition of the harshness of "jail time." *See* Statement of Reasons, *United States v. Hurt*, Case No. 17-cr-285 (Fischer, J.) (W.D. Pa. Nov. 6, 2020) (granting variance, in part, because defendant "served time during COVID-19 with protocols in place, making it more onerous and

---

[1] This attack was the second time Mr. Cockrill was sexually assaulted while in custody. *See* PSR ¶ 116.

also restricted access to programming"); Statement of Reasons, *United States v. Stevens*, Case No. 18-cr-32 (Fischer, J.) (W.D. Pa. Nov. 5, 2020) (same); Sentencing Hearing, *United States v. Reddix*, Case No. 19-376 (Conti, J.) (W.D. Pa. Mar. 18, 2021) (granting variance, in part, because Allegheny County Jail has had "horrible conditions with the lock down" because of "the inability to see loved ones [and] inability to have more frequent phone calls with family," as well as the lack of programming); Sentencing Hearing, *United States v. Cox*, Case No. 18-cr-50 (Cercone, J.) (W.D. Pa. May 18, 2021) (granting variance, in part, based on the "limitations on [defendant's] liberty that prisoners normally have" in jail).

Mr. Cockrill's victimization while in custody at FDC SeaTac exposes reality. Unfortunately, "brutal assault and homosexual rape are facts of daily life in men's prison." Marjorie Rifkin, "*Farmer v. Brennan*: Spotlight on an Obvious Risk of Rape in a Hidden World", 26 Columbia Human Rights Law Review 273, 276, 278 and n. 24 (1995).

One of the most important departure cases involved vulnerability to abuse in prison. *Koon v. United States*, 518 U.S. 81, (1996). The Ninth Circuit recognized this departure basis in a Montana case. *United States v. Parish*, 308 F.3d 1025 (9th Cir. 2002).

With the passage of the Prison Rape Elimination Act in 2003, Congress recognized that rape in federal, state, and local prisons is a problem that is not going

away. In the Act, Congress estimated that 13% of inmates in the United States have been sexually assaulted, many of them repeatedly, and stated that likely over 1,000,000 inmates have been sexually assaulted in the past 20 years. 34 U.S.C. § 30301(2). Congress intended to establish "a zero-tolerance standard", 77 Fed.Reg. 30873, towards prison rape and "make the prevention of prison rape a top priority in each prison system." 34 U.S.C. § 30302(2).

Rape is an institutionalized tradition, considered by prisoners a legitimate way to "prove your manhood" and satisfy sexual and power needs. *Training Americans to Rape: The Role of Our Jails, Prisons and Reformatories* (USA Today Magazine, May 1995). Violence and struggles for dominance in jail culture often play out sexually. L.H. Bowker, *Prison Victimization*, at 15-16 (Elsevier 1980). Violent combat to establish placement in the hierarchy is a routine part of men's introductions to prison, and these confrontations often play themselves out as rapes. L. Tofani, *Rape in the County Jail: Prince George's Hidden Horror*, Washington Post, September 26-28, 1982; Bowker, *Prison Victimization*, at 15-16 (Elsevier 1980).

## C. Mr. Cockrill's personal characteristics.

> Thomas needs extensive mental health working alongside professionals practicing techniques and cop[]ing skills so when he gets released from prison he can be an upstanding and helpful citizen being able to become a better individual. – Letter of Julie Vinton, partner.

Mr. Cockrill was removed from the custody of his birth mother when he six years old. PSR ¶ 104. He spent the next two years in foster homes, before being adopted by the Cockrill family when he was eight years old. PSR ¶ 105. This relationship was strained, apparently due to Ms. Cockrill's reliance on corporal punishment and Mr. Cockrill's childhood disciplinary issues.

Mr. Cockrill suffers from persistent mental health problems, PSR ¶¶ 118-128. Positively, Mr. Cockrill does not appear to suffer from serious substance abuse issues. PSR ¶¶ 129-131. Although Mr. Cockrill has used controlled substances in the past, and used alcohol excessively for a number of years, he has successfully controlled those habits and has been sober since 2020.

Mr. Cockrill is primarily self-employed as a contractor and landscaper. He has a landscaping business registered with the State of Montana, Blue Collar Architectural Design. PSR ¶ 137. He is capable of making the anticipated restitution payments. PSR ¶ 157.

# CONCLUSION

Mr. Cockrill requests a mandatory minimum sentence of seven years imprisonment, consecutive to concurrent, below-Guidelines sentences on Counts I-III.

RESPECTFULLY SUBMITTED this 18th day of October, 2022.

          THOMAS SCOTT COCKRILL

          /s/ John Rhodes
          JOHN RHODES
          Assistant Federal Defender
          Federal Defenders of Montana
          Counsel for Defendant

# CERTIFICATE OF SERVICE

I hereby certify that on October 18, 2022 a copy of the foregoing document was served on the following persons by the following means:

| | |
|---|---|
| 1, 2 | CM-ECF |
| ____ | Hand Delivery |
| 4 | Mail |
| ____ | Overnight Delivery Service |
| ____ | Fax |
| 3 | E-Mail |

1. CLERK, UNITED STATES DISTRICT COURT

2. TARA ELLIOTT
   Assistant U.S. Attorney
   Counsel for the United States of America

3. JR WALLER
   United States Probation Office

4. THOMAS SCOTT COCKRILL
   Defendant

By: /s/ John Rhodes
JOHN RHODES
Assistant Federal Defender
Federal Defenders of Montana
Counsel for Defendant

Federal Defenders of Montana
125 Bank Street, Suite 710
Missoula, Montana 59802
(406) 721-6749                    12